BETHLEHEM STEEL CO. v. FIRTH STERLING STEEL CO.

(Circuit Court of Appeals, Third Circuit.  June 22, 1915.)

No. 1906.

PATENTS ⬤⟶328—ANTICIPATION—ARMOR-PIERCING PROJECTILE.

The Davis patent, No. 945,492, for an armor-piercing projectile, comprises in combination a sharp-pointed projectile, a soft metal cap surrounding and supporting the point of said projectile, and a hollow contour cap or shell over the same which, when secured to the projectile, leaves a hollow space between its extreme point and the forward point of the soft metal cap.  All of these elements were not only singly old in the art, but there were also known combinations of the pointed projectile with the soft nose cap and with the contour-cap and of a blunt head projectile with both.  *Held*, that in view of such prior art the patent is void for anticipation, especially by the Hadfield British patent, No. 16,901, of 1898.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by the Firth Sterling Steel Company against the Bethlehem Steel Company.  Decree for complainant and defendant appeals.  Reversed.

For opinion below, see 216 Fed. 755.

J. A. Watson, of Washington, D. C., and Livingston Gifford, of New York City, for appellant.

Melville Church, of Washington, D. C., for appellee.

Before McPHERSON and WOOLLEY, Circuit Judges, and THOMPSON, District Judge.

WOOLLEY, Circuit Judge.  This is an appeal from a decree of the District Court of the United States for the Eastern District of Pennsylvania, holding valid and infringed letters patent No. 945,492, granted to Cleland Davis, on January 4, 1910, upon an application filed April 21, 1908, for a contour-cap for projectiles.

Both parties to this action are manufacturers of armor-piercing projectiles.  When this suit was instituted, the United States government was their principal, if not their sole, customer.  The Firth Sterling Steel Company, the complainant, manufactures under the patent in suit.  The Bethlehem Steel Company, the defendant, manufactures upon a government design, which, it is claimed, infringes the patent of the complainant.  The two projectiles are so alike in the essentials of their functions and structure, that if the patent is valid or is construed to be as broad as its terms, infringement must be found.

The Davis patent, as disclosed by a typical claim, is for—

"the combination of a pointed armor-piercing projectile; a soft metal cap surrounding and supporting the point of said projectile; and a contour-cap secured to said projectile having a shape adapted to give to the projectile as a whole that contour best adapted for piercing the air with the minimum re-

sistance and said contour-cap when in position on the projectile leaving a hollow space between its extreme forward point and the forward point of said soft metal cap, substantially as described."

As broadly construed by the learned trial judge:

"The design of the patentee consists of an armor-piercing projectile of standard, or any desired, type, having any desired cavity for explosives, any desired degree of sharpness to enable it to most readily penetrate, with the point protected and supported in any desired manner to make its power of penetration effective, with the point inclosed in a shell or cap so formed as to give the whole projectile any desired contour to promote length of flight, the shell having a cavity or space in front of the nose of the projectile proper so that the functioning of the nose construction may not be hampered."

To understand the meaning of the patent and the breadth of its claims as construed, something of the prior art must be known. Long before the conception of Davis, it was known that the flight of a projectile was affected and in a measure controlled by its contour. It was found that a sharp-pointed projectile would travel faster and farther than a dull-pointed or a blunt projectile, but upon impact, the sharp point would be "upset" and the penetration of the projectile retarded or prevented. It was found that by surrounding and laterally supporting the sharp point of a projectile by a cap of relatively soft or ductile metal, its point would be protected and its penetrating function preserved. While there is no difference of opinion with respect to the efficient result of so protecting the point of a projectile, there has been a wide difference of scientific views with respect to its precise action. One theory was that the softer metal acted as a lubricant to the hardened metal of the projectile; another, that it bent back the armor plate before the impact of the point of the projectile; but the latest and probably the prevailing theory is, that as the radial inertia of the cap is a great deal more than its tensile strength, the point of the projectile is thereby supported laterally, and passes unbroken into the hard face layers of the plate and opens the way for the projectile thereafter to perforate the body of the plate by its true boring action.

The protection of the hard point of a projectile by a soft metal nose was a great discovery, but it had one drawback, namely, when the soft metal nose was placed upon and around the point, it disturbed the contour of the projectile and correspondingly retarded its flight, and therefore diminished its velocity at the time of impact. To preserve the advantage of length of flight and velocity upon impact, produced by the proper contour of a projectile, and also the power of penetration, assisted and aided by a soft metal cap, Davis claims to have made his invention. To obtain in a projectile these opposing forces, both Davis and the appellant made projectiles which contained the same elements, namely, a projectile of the standard type, the point of which is surrounded and laterally supported by a soft metal cap, connected with which in different ways is a hollow metal contour-cap. The first figure below represents the alleged infringing projectile of the Bethlehem Steel Company, the defendant, and the second repre-

sents the projectile of the Firth Sterling Steel Company, the complainant.

Davis claims that by his invention the flight of a projectile is lengthened, its trajectory flattened and its ability to penetrate preserved. He does not claim to have invented the separate elements that produce or contribute to these results, but that he has made an improvement over the prior art by combining these elements, which are: (a) A pointed armor-piercing projectile; (b) a relatively soft metal cap surrounding and supporting laterally the point of the projectile; (c) A contour-cap having an external shape adapted to give the projectile as a whole that contour best adapted for piercing air with the minimum resistance; and (d) having a hollow space between the extreme forward point of the contour and the portion of

the soft metal that surrounds and supports the point of the armor-piercing projectile.

The invention claimed by Davis, therefore, is a combination of elements in one structure. Davis does not deny that these elements are old in the art. In truth, he admits in his specification, both by expression and inference, that they already existed, but maintains that he employed them in a new combination which produced a useful result not theretofore attained. It is contended by the defendant, however, that there existed in the prior art not only the elements employed by Davis in his combination, but certain combinations of those elements, which are the same as the combination for which Davis claims invention. These opposing contentions are so involved that it becomes necessary to ascertain: First, what are the elements in Davis' combination and whether they are old; and second, whether his claim to an invention of a combination has been anticipated by a combination of substantially the same elements, producing the same results in substantially the same way. Our inquiry, therefore, briefly stated, is, What did Davis contribute to the art which was not already there?

Armor plate was old. Armor-piercing projectiles were old. As in the progress of the art, armor plate from time to time was hardened, so the problem of increasing the armor-piercing quality of projectiles was progressively presented and solved.

As stated by Davis in his specification, it was well known—

"that there is a certain contour, or taper, which, when given to the exterior of projectiles, causes them to meet with a minimum resistance from the air."

A projectile tapered to a point, for the purpose of reducing air resistance, flattening its trajectory, prolonging its flight and maintaining

its velocity at the time of impact, was old in the art. Journal U. S. Artillery 1895. The contour of a projectile of the caliber measurement employed by Davis appears in United States letters patent No. 841,861 to Gleinich in 1907. Gleinich discovered that the radius of curvature of the head of a projectile, in order to maintain the longest flight and to maintain the greatest efficiency upon impact, should be within the limits of 4.7 calibers and 8.2 calibers, the "Caliber" being the diameter of the projectile. Following Gleinich, manufacturers of projectiles have generally employed the mean of these two calibers, Davis choosing 6 calibers or diameters, and those who designed the alleged infringing projectile selecting 7 calibers radius of curvature.

Before Gleinich's discovery in 1907 of the best mathematical contour to reduce air pressure, pointed projectiles of various dimensions existed, as shown by United States letters patent No. 541,280 to Johnson, 1895; British patent No. 8,764 of 1900 to Staunton; British patent No. 751 of 1904 to Motteram; United States letters patent No. 720,242 to Hadfield, 1903; and United States letters patent No. 875,-023 to Wheeler and McKenna, 1907. It therefore appears that in 1908, pointed projectiles were old, and the function of contour was known in the art, and neither was discovered or by mechanical contrivance improved by Davis.

The use of hollow caps upon projectiles, for the purpose of reducing air resistance, was very old. Caps for this purpose have been employed since 1860 upon projectiles of different designs which at different periods were standard designs. British patent No. 1,872 of 1860 to Haddan, was granted for an improvement to projectiles, "by adding or affixing pointed peaks, caps, or fronts to or upon cylindrical, or to or upon flat-headed shot and shell." The Haddan cap, like the cap in British patent No. 1,615 of 1863 to Clark, was a cap made with a contour considered the best adapted to assist the flight of a blunt-headed projectile, then the standard projectile. The shape and arrangement of the Haddan and Clark caps are shown by drawings in the letters patent, as follows:

**Haddan's 1860 Projectile.**

Haddan's British Patent No. 1,872 of 1860 (Appellant's Ex. Book, p. 41).

"Thin sheet metal cap * * * to assist the flight without adding materially to the weight at the front- end so produced upon the projectile" (page 38).

**Clark's 1863 Projectile.**

Clark's British Patent No. 1,615 of 1863 (Appellant's Ex. Book, p. 71).

"False conical or other shaped head or end on a plan which shall aid their flight, * * * by reducing friction in cleaving the air" (page 63).

United States letters patent No. 465,230 to Wilson, 1891, were for a hollow cap affixed to a projectile that was pointed in the sense of having angular shoulders of different sizes. The cap was especially designed to reduce air resistance. British patent No. 16,901 of 1898 to Hadfield, was a patent for a combination including a hollow cap, to deflect air and facilitate flight. So also were British patents to Staunton, 1900, and to Motteram, 1904, before cited. The use and function of hollow caps, therefore, were long known.

Soft metal caps of various designs, but intended to perform the same function, surrounding and laterally supporting and protecting the sharp points of projectiles, were old in the art. To Johnson may be credited the invention of surrounding and enveloping the point of a projectile with a soft metal cap. For his invention he was granted United States letters patent No. 541,280, in 1895. While he neither stated nor knew the scientific reason for the action of a soft metal cap in preventing the upsetting of the point and in assisting the penetrating quality of a shell, he knew and disclosed to the art the function of such a cap and its results. A hard-pointed projectile, capped with a soft metal nose, as conceived by Johnson, appears in the drawings of his patent, as follows:

Johnson's 1895 Projectile.

Pointed Armor Piercing Projectile with Soft Cap.

Johnson U. S. Patent No. 541,280, Issued June 18, 1895 (Appellee's Ex. Book, p. 105).

Following Johnson, British letters patent, No. 8,764, of 1900, to Staunton, disclose a soft metal nose upon the sharp point of a projectile, as do United States letters patent, No. 720,242, to Hadfield, 1903, and United States letters patent, No. 875,023, to Wheeler and McKenna, 1907.

As Davis' application for letters patent was filed April 21, 1908, it thus appears that sharp-pointed projectiles were old; that the use of hollow contour-caps upon and in combination with projectiles of all kinds, including sharp-pointed projectiles, for the purpose of aiding flight, was old; and that the use of soft metal caps upon and in combination with projectiles of all kinds, including sharp-pointed projectiles, surrounding the point for the purpose of aiding penetration, was old. Therefore it appears that not only were sharp-pointed projectiles, hollow contour-caps and soft metal noses old, but that the combination of a pointed projectile and a hollow contour-cap and the combination of a pointed projectile and a soft nose cap, were old. The only remaining combination, therefore, which, if new, possesses the merit of novelty and entitles Davis to a patent, is a combination of these combinations, whereby a projectile having a sharp point surrounded by a soft metal nose *is enclosed* in a hollow metal contour-cap.

Having been told as early as 1860 and 1863 by Haddan and Clark of the function of hollow metal caps as wind deflectors, and having been taught by Johnson in 1895 the penetrating function of a soft metal

nose on the hard metal end of a projectile, Sir Robert Abbott Hadfield, in 1898, combined the two by surmounting on the hard metal end of a projectile a soft metal cap, and surmounting on the soft metal cap a hollow contour-cap, obviously with the intention of obtaining in combination the advantages with respect to flight and penetration which he had been told each cap possessed.

The following is a drawing of the Hadfield projectile, as appears in his letters patent:

Hadfield's 1898 Projectile.

Hadfield's British Patent No. 16,901 of 1898 (Appellant's Ex. Book, p. 81).

British patent No. 16,901 of 1898 to Hadfield, shows two kinds of caps, with respect to which the patentee says:

"I produce projectiles * * * with blunt heads, which I furnish with what are known as caps, and sometimes with devices I call air deflectors, which are adapted to reduce resistance and thereby to facilitate the flight of the projectile through the air."

Two structures are produced in the drawings, being precisely alike with the exception that the one here reproduced has the addition of the hollow metal cap or "air deflector." Each consists of a projectile with a contour tapering toward the head. The head is somewhat rounded, but as it is not pointed, we, like Hadfield, will call it a blunt head. Upon this blunt head is placed a solid cap, which, as the patentee says, "may be of any suitable metal, either hard, soft, or medium, but preferably I make them of soft steel." When the soft metal cap is thus added to the hard metal projectile, there is added to the structure a—

"hollow metal conoid, conveniently attached to the (soft metal) cap, as by screwing, so that when it is in place, the thus built up front ogival part of the projectile is completed to a point."

This structure, therefore, contains in combination four elements: (1) An armor-piercing projectile; (2) a soft metal cap; (3) a hollow metal cap fastened to and enveloping the soft metal cap; and (4) a contour given to the three, tapered with regard to flight.

The defendant urges that the combination of Hadfield embraces all the elements of the combination of Davis and anticipates his invention, but the complainant contends that the Hadfield combination of a soft metal cap and a hollow metal cap upon a projectile related and was limited to a combination upon such a projectile as is shown by Hadfield, which was a blunt head projectile, basing the contention upon the theory that Hadfield dealt with the problem presented by the standard projectiles of his day, which were blunt, while Davis dealt with and solved a problem which had to do with the standard projectiles of his day, which were pointed, and therein lies a difference in problems and a corresponding difference in inventions. With

this contention, evidently, the learned trial judge was seriously impressed. He said:

"This brings us to the defense of anticipation so far as involved in the state of the art before the Phillips design. This is best presented in the Hadfield patent. The strength of the argument lies in this: In the Hadfield device, as in the Davis design, the essential idea was to surmount the projectile designed for penetration with a hollow cap which would transform the projectile as a whole into one having the qualities of prolonged flight. The then prior state of the art as to the ballistic form of projectiles must be remembered. *The sharp point form of projectile had not as yet been adopted.* Hadfield dealt with the projectile proper as it was. It is within the limits of fair surmise that *had the pointed form with the soft metal nose been then in use* his design would have incorporated it. In this lurks the only doubt in the way of a finding that the Davis idea had not been anticipated. Although, however, Hadfield might have incorporated the sharp point feature *had it then been known,* he in fact did not. He might also have overlooked the combination of nose and point, as did those who first followed him. He might also have extended his design by first discovering the merits of the sharp point feature and then incorporating it with the others. Here again, however, he did not. The possibility of what he might have done does not detract from what Davis did."

But the art discloses that at the time of Hadfield's invention and theretofore sharp-pointed projectiles existed, and to some extent had been adopted. Johnson knew it three years before. It is fair to assume Hadfield got his idea of a soft metal cap from Johnson. If so, we must assume that he knew of sharp-pointed projectiles of the type to which Johnson combined the soft metal cap. With this knowledge, Hadfield, in describing his invention, states that:

"Although I have shown examples by way of illustration, it is to be clearly understood that I do not limit myself to the forms of blunt-headed projectiles or to the forms of caps, * * * as they may evidently be more or less varied according to the requirements, as may also the proportions of the parts and the materials used."

We, therefore, do not agree with the statement upon which the learned trial judge based discussion, and perhaps, was influenced in his decision, that "the sharp point form of projectile had not as yet (that is, at the time of Hadfield's invention) been adopted." The projectile with the *sharpest* point had not then been adopted, but sharp-pointed projectiles of different caliber, as distinguished from blunt head projectiles, had been adopted. If the testimony is not clear that in Hadfield's day a sharp-pointed projectile was a standard projectile, and that if Hadfield's patent is not broad enough to embrace a combination of a contour-cap, a soft metal cap and a sharp-pointed projectile, then such a combination may be found in British letters patent No. 8,764 of 1900 to Staunton, which, like the patent to Hadfield of 1898, antedates Davis' application for a patent.

The Staunton patent discloses a combination of a sharp-pointed shell, the point of which is covered and surrounded by a "pad of lead or other comparatively soft metal which is enveloped by a casing or contour-cap" in a way strikingly similar to that employed by Davis. The function of the soft metal "pad" is not made clear. Nevertheless it is there, and it is enveloped in a hollow contour-cap attached to the body of a sharp-pointed projectile. We are not satisfied that

Staunton taught the art the function of the soft metal cap. Its function, however, had been disclosed by Johnson five years before; and by those conversant with the art, the use of such a "pad" might readily be inferred. But in Hadfield's invention, resort need not be made to inference. He combined in one structure all that was combined by Davis in his structure, each element in the two combinations possessing like functions. The one difference was in the character of the projectiles used. The question of anticipation then is resolved to this: Whether Hadfield's invention was restricted to blunt head projectiles or extended to sharp-pointed projectiles then known to the art, in view of his saving clause that "it is to be clearly understood that I do not limit myself to the forms of blunt-headed projectiles."

It is evident that Johnson, Hadfield and Davis intended to include in the combinations which they respectively patented an armor-piercing projectile such as was known and in use at the time of their respective inventions. It is certain that at the time of Hadfield's invention, there were two kinds of projectiles, blunt-headed and sharp-pointed. Which was the standard projectile or which was the better or more commonly used projectile is unimportant, in view of the fact that both existed and that both were armor-piercing projectiles. Upon the blunt head projectile, Hadfield surmounted the soft metal cap. Had the use of such a cap been possible only on a projectile of the blunt head type, then obviously Hadfield's invention would not anticipate Davis'; but to transpose Hadfield's conception of a soft metal cap for a blunt-headed projectile into a soft metal cap for a sharp-pointed projectile would not call for invention. It would require only the skill of a mechanic. Hadfield's invention, therefore, extends equally to both kinds of projectiles.

Novelty of a soft metal cap or a soft metal nose for a sharp-pointed projectile was exhausted by the Johnson patent. After Johnson had disclosed the function and the result of a soft metal nose on a sharp-pointed projectile, and after Hadfield had taught the art how to put both a soft metal cap and a hollow contour-cap on an armor-piercing projectile and preserve thereby in one structure the functions of both, there was left nothing for invention but the various means to be employed in attaining the same result. The difference in such means is largely a difference in mechanics and proportions, a difference in mechanics in determining the best method for joining the three structures, a difference in proportion in ascertaining the best contour to be obtained by the union. Neither Hadfield nor Davis attempted to patent the precise measurements of the contour. Each used such proportions as in his opinion was "best adapted for piercing the air." Neither patented nor obtained a monopoly of the special contour which each adopted. The only difference in contour of the two caps is the difference in proportion, determined by caliber, and in this respect Davis had the advantage of Hadfield in being taught by Gleinich a mathematically correct contour. There would then seem to remain merely a question whether Davis is entitled to a patent for the mechanical means employed in his combination, and this question is not here in issue.

It is important to note that for years prior to the design and the manufacture of the two projectiles in controversy in this action, the old conflict between armor plate and armor-piercing projectiles continued to be waged. The Bureaus of Ordnance of the War and Navy Departments of the United States, acting through their officers and officers of the Army and Navy, in conjunction with both of the parties to this action, had been continuously engaged in efforts to perfect projectiles of types that would prevail against improved armor plate. These efforts were directed along the old lines of obtaining projectiles with the minimum of air resistance and a maximum of velocity and flight, as well as the maximum power of penetration. The two projectiles in controversy are the direct results, perhaps separately attained, of these efforts. Plans of projectiles were made by the Bureaus of Ordnance. The government, being without an ordnance factory, employed at different times both of the parties to this action to manufacture projectiles according to their designs; but, possessing proving grounds, the government made and conducted its own trials. The Army and Navy officers connected with the Bureaus of Ordnance were in a large measure conversant with the designs and the results of trials made from time to time; and the parties to this action, in manufacturing projectiles upon the government's plans, became well aware of what was progressing in the government's bureaus of ordnance and at the government's proving grounds.

By trials made in the fall of 1906, the Army Bureau of Ordnance found that a sharp-pointed projectile with a 7-caliber point radius produced a greater range and a flatter trajectory than the projectile then in use. These tests were conducted by Capt. William A. Phillips of the Army, who, fearing that the increased range of the projectile of the higher caliber was attained at the expense of the penetrating ability of the projectile, set about to design a projectile that would preserve the several essentials of maximum flight, velocity and penetration. On May 4, 1907, he submitted to the Bureau of Ordnance a drawing of a full-sized projectile, the construction of which consisted of a sharp-pointed projectile, a soft metal nose and a hollow cap, the whole possessing the same elements and forming a contour almost identical with that of the patent in suit, as well as with the alleged infringing projectile. Phillips, however, intended to use in the hollow cap a lubricant of nonliquid oil and graphite. The sketch appealed to the bureau as possessing merit, and an order was made for the manufacture of six shells from Phillips' design, the hollow caps of two of which were to contain a lubricant, concerning the advantages or functions of which the bureau had doubts, and the hollow caps of four were to remain empty. The trial of the projectiles, made in accordance with Phillips' design, was postponed until after the completion of other trials already ordered, with the result that a trial of the Phillips' projectile was never made. Although tests of the Phillips' projectile were never made, the Phillips' design was adopted by the bureau, and is the basis of the government's design upon which the alleged infringing projectiles were ordered and made. The designs of the Phillips and the Army projectiles are here reproduced for comparison with the designs

of the alleged infringing projectiles and the Davis projectile, produced in the beginning of this opinion:

Capt. Phillips' 1907 Projectile.

As recommended to the Chief of Ordnance, U. S. Army, by the Ordnance Board, U. S. A., May 24, 1907. Four of this design recommended for test.

U. S. Army's Design.

Drawing "Enc.-17" July 27, 1908 (Appellant's Ex. Book, p. 139).

Referred to by the Chief of Ordnance, War Department in communication of July 28, 1908 (page 134). In reply communication of July 31, 1908, the Ordnance Board, U. S. A., said: "The Board notes that the design shown on Enc.-17 is similar to that submitted by Capt. Phillips, Ord. Dept." (page 136).

On April 21, 1908, or about a year after Phillips had made and submitted his design, Cleland Davis, then Lieutenant-Commander in the Navy, applied for and was subsequently granted the patent in suit, a drawing from which has already been reproduced.

The defendant charges that Davis secured his ideas from Phillips' design, and in addition to its defense of invalidity for want of novelty, the defendant avails itself of the defense provided by the second paragraph of section 4920, R. S. (Comp. St. 1913, § 9466), namely:

"That he had surreptitiously or unjustly obtained the patent for that which was in fact invented by another, who was using reasonable diligence in adapting and perfecting the same."

The evidence does not disclose that Davis saw the Phillips' design. It is in evidence that Davis was informed by officers of the Bureau of Ordnance of what was being done generally in the progress of developing projectiles. There is much testimony concerning the invention of Phillips, his diligence in perfecting his design, and whether or not his design anticipated Davis' invention. While the testimony is sufficiently strong to convince us that the Phillips' design was the basis of the army design, and likewise of the alleged infringing projectile built upon the government's orders, we are constrained, however, to arrive at the conclusion, considered with respect to the law of patents, that Phillips' invention did not progress beyond a drawing, and therefore cannot defeat the patent in suit.

Two projectiles of the Davis type were made and upon trial proved unsuccessful. The caps fell off in flight. This doubtless was due to mechanical defects. Nevertheless, it does not appear that more projectiles were ever made from the design of the patent, although the projectiles made by the complainant are claimed to be within the scope of the patent.

A comparison of the designs of Davis, the army and the defendant, with the design of Phillips, shows in essentials a striking similarity. The one substantial difference disclosed is, that in projectiles of the

army, Phillips' and the defendant's designs, the hollow contour-cap is screwed upon the head of the soft metal cap, just as Hadfield taught in 1898, and the contour of the whole structure is derived from the harmonious caliber of its parts, while in the Davis structure, the hollow contour-cap alone supplies the whole contour and envelops the soft metal nose and a considerable portion of the projectile proper. But, to make one more comparison, the Davis contour-cap envelops the soft metal cap just as Hadfield taught in 1898, and envelops as well a part of the projectile, as Staunton taught in 1900. The difference between Davis' projectile and projectiles of the types of Hadfield, Staunton, Phillips, the army and the defendant is simply in contour and proportion and the mechanical means of affixing caps to projectiles.

We are therefore of opinion that Davis' invention of a combination of the elements described was anticipated by the prior art, and particularly by British patent No. 16,901 of 1898 to Hadfield, and that claims 1, 2, 7, 8, 9, 10 and 11 of letters patent No. 945,492, to Davis, are invalid.

The judgment below is reversed.