Booth, Chief Justice,
delivered the opinion:
This is a patent suit brought by the plaintiff under the act of June 25, 1910, as amended by the act of July 1, 1918, for an alleged infringement by the Government of plaintiff’s patent #1141415, granted June 1, 1915. No jurisdictional issue is involved. The patent in suit concerns the exterior contour or shape of a shell, and the value and utility of the alleged invention are said to reside in an increased reduction of atmospheric resistance and thereby procure a maximum *60 of range and accuracy. Claim 3 of the patent is relied upon to establish infringement. It is worded as follows: .
“ 3. A hollow projectile provided with a cap the ogive of which is struck on at least 6 caliber radius, a cylindrical portion of less diameter than the bourrelet that but slightly exceeds in length the caliber of the projectile, and a beveled base terminating in a reduced diameter.”
Figs. 1 and 2 of the patent illustrate plaintiff’s conception.

The explanation of Fig. 1 taken from the specifications recites that 1 indicates the cylinder of the shot extending from the bourrelet 2 to the rotating band 3, and which but slightly exceeds in length the caliber of the shot. The bourrelet of a shell is a slight enlargement of the same just at the point where the cylindrical portion joins the ogive, this enlargement forming the front bearing surface of the projectile on the interior wall of the gun (2). Reference numeral 4 indicates the ogive of the shot proper. The term “ ogive ” of a projectile has reference to the entire superficial surface of the same, which extends forward from the bourrelet or front end of the cylindrical surface to the tip or point of the shot. The specifications in terms specify this element of the shell as “ struck from a center on a line perpendicular to the axis of the shot and about 2.6 calibers radius.” The inference numeral 5, again resorting to the words of the specifications, “indicates a uniform tapered *61 real’ end diverging from a line of the cylinder at an angle of 11° 18' and terminating with a base perpendicular to the axis of the shot and equipped with a base plug, fuse plug and vent plate 6 of any usual or preferred style, it being understood the base plug opening is sufficiently large to admit a tool for boring out the shot to desired dimension.” Reference numeral 7 “ indicates a soft steel cap secured in the usual way to the ogive of the shot. This cap is struck on a 7.5 caliber radius and is designed to displace the air at 0.186% of the velocity of the fired projectile.” The object of the invention as stated by the patentee “ is to produce a long range armor-piercing projectile that may be used in present constructed guns,” and then follows a descriptive demonstration of the adaptation of the means to the desired end.
Fig. 2 relates entirely to the structural features of the base of the shell. We need only to assert the familiar rule that claim 8, the single claim upon which this litigation is founded, is to be construed in view of the patentee’s specifications and the state of the art. The prior art publications and exhibits disclose without doubt, and it is conceded, that the problem which the plaintiff was seeking to solve was neither original with him nor its inherent difficulties unknown or unnoticed. All that the plaintiff claims is improvements in projectiles, and the forward step in that direction is ascertainable from the prior art. As early as 1865 Alexander Holley published “A Treatise on Ordnance and Armor,” in which he illustrated the construction of shells having a rounded point or ogive, with a tapered rear, terminating in a reduced diameter. The shell illustrated did not possess a bourrelet or a cylindrical portion of reduced diameter. The illustration reproduced here clearly indicates this fact.

*62 But this type of shell was later, in 1873, described and ballistic science in this respect -commented on by Sir Joseph Whitworth in a publication entitled “ Miscellaneous Papers on -Mechanical Subjects, Guns and Steel.” In this publication the author said:
“ The projectile with tapered rears is the best for flight in all cases, but the increase of range produced by the taper is not important at low elevations. The advantage increases in proportion to the elevation. In the longest ranges a shot with a taper rear will range upwards of a mile farther than one that is parallel; it is, therefore, very desirable to use it for long ranges.”
That Holley and Whitworth conceived the importance of contour and design in the construction of shells and the functioning elements of the same in overcoming air resistance and obtaining range and accuracy is not only apparent by way of illustrations but by comment as well. It is true Holley’s shells were in a measure crude, but they do effectually illustrate a step in the effort towards the perfection of a shaped shell of maximum efficiency. To the same effect and evidencing the existing state of the art are the following citations: Text Book of Small Arms, 1909; Revue de L’Armee Beige, 1905-1906; Ordnance and Gunnery, United States Naval Institute, 1910.
United States patent to Gleinich, antedating plaintiff’s, embodies as to contour a sharp pointed ogival head stated to be from 4.7 to 8.2 calibers. Gleinich obviously did not conceive a beveled rear base or the reduction of the cylindrical portion of his shell. His patent was granted in January; 1907, and pointedly serves to attest the fact that a pointed nose is “ the most desirable form of head-wave for projectiles at high velocities,” the inventor directing his efforts towards the perfection of small arms at high pressure and great velocities. In this same year, 1907, one Ormond Lissak published his book, Ordnance and Gunnery. In this publication the author illustrates a shell, a small-arms shell, with an ogival head struck on a radius of 1 y2 to 3 calibers, the cylindrical portion of the same being about 0.07 inch less than the diameter of the bourrelet. The prescribed contour did not meet with success, and the illus *63 tration cited was not of hollow construction and its base was curved, but it does illustrate the antiquity of contour predicated upon ogival formation of the nose of a shell and the constructive form of the cylindrical portion less than the diameter of the shell. Two patents granted Wheeler and McKenna, the first in 1903 and the second in 1907* demonstrate beyond doubt that it was old in the art to provide a hollow base-fused armor-piercing projectile with a soft metal cap, and design the same upon a dimensional proportion wherein the cylindrical portion of the projectile but slightly exceeds the caliber of the shot. The 1907 patent above cited discloses a construction wherein the cylindrical portion thereof exceeds the caliber of the shot by about 15%. The Wheeler and McKenna patents possessed a square base and the radii of the ogival portions were less than 6 calibers, but they do disclose in connection with other exhibits in the art that the fundamentals of the science as to shape and contour were well known and long practiced. A patent to C. Davis, granted January 4, 1910, is, we think, of such signal importance in the prior art as to warrant the

insertion at this point of the patentee’s illustration thereof, identified by him as Fig. 8.
Davis in delineating the purpose of his invention in the following quotation of the language used, a portion of which we italicize, discloses what the art had long recognized and known, that the attainment of efficiency in shell construction was dependent upon the contour and shape of the shell. Davis said:
“ My invention relates to contour caps for projectiles, and has for its object the provision of such a cap as will *64 decrease the air resistance of modern standard projectiles, and therefore increasing their velocity and accuracy during flight.
“ It is now well known that there is a certain contour, or taper, which when given to the exterior of proyectiles, causes them to meet with a minimum resistance from the air/ and it is equally well known that this particular contour or taper is not the best adapted for armor-piercing qualities. In other words, if a projectile is given the best shape for piercing armor, it will not meet with a minimum air resistance during flight; and if it is given the best shape for cleaving the air, it will not possess its best armor-piercing qualities.
“ My invention accordingly consists in providing a standard armor-piercing or other projectile with a contour cap, which will during flight give the projectile as a whole that contour best adapted for penetrating the air, and which upon impact is destroyed, thereby leaving the projectile with its best armor-piercing contour unimpaired.”
The Davis patent likewise discloses a tapered rear cap described by him as functioning “ to fill the vacuum formed at the base of the projectile while in flight,” and claims 5 and 6 of the patent so unmistakably disclose the inventor’s conception of contour and design essential to accomplish efficiency in the art that we also quote them.
“ 5. The combination of an armor-piercing projectile, a forward contour cap having a radius of curvature substantially six times the diameter of the projectile, and a tapered collapsible cap at the base of said projectile, whereby a minimum resistance through the air is encountered during flight, substantially as described.
“ 6. The combination of a projectile; a soft metal cap; a forward contour cap having a shape adapted to give to the projectile as a whole that contour best adapted for piercing the air with a minimum resistance; and a tapered cap attached to the base of said projectile adapted to partially fill the vacuum caused during flight, substantially as described.”
The cylindrical portion of Davis’s projectile is of less diameter than the bourrelet, i. e., approximately 33% longer than the caliber of the shell. A comparison of the plaintiff’s claim 3, herein involved, with the Davis disclosure brings into view the following striking similarities:
*65 Claim 3 Davis patent
(1) A hollow projectile provided with a cap, the ogive of which is struck on at least 6-caliber radius; (1) Standard armor-piercing projectile, provided with a cap, the ogive! of which is struck on a 6-cali-ber radius;
(2) A cylindrical portion of less diameter than the bourrelet that but slightly exceeds in length the caliber of the projectile; and (2) A cylindrical portion of less diameter than the bourrelet which exceeds in length the caliber of the projectile by 33 per cent;
(3) A beveled base terminating in a reduced diameter. (3) A beveled or tapered base terminating in á point or reduced diameter of zero value.
We think it firmly established by the prior art that every feature of the plaintiff’s patent had been anticipated; i. e., prior patents embody particular elements and others embody the combination of elements relied upon by the paten-tee, notably Davis.
The exacting problem of the science was known to be the overcoming of atmospheric resistance in the flight of a shell and also well known that the road to the solution of the difficulty lay within the limits of contour and design of the projectile as well as other well-known features. External ballistic science engaged the attention of experts in ordnance, each of whom knew from actual study and experimentation the retarding effects of atmospheric pressure, both upon the nose and the rear of projectiles, and each of whom in conjunction with others was attempting to perfect a design that would minimize this obstacle in the way of efficiency. Surely it may not be, and it is in fact not. contended that ogival points were new, or dimensional proportions of the cylindrical body of the shell were subject to basic patents. The art, we think, was a crowded one and the latitude for invention circumscribed within narrow limits. So far as this record is concerned, all that was seemingly left to the inventor was the accomplishment of *66 the identical thing we think he did accomplish, and that is the combination of old elements in the manner and form described, and in the precise way and according to the precise dimensions described and mathematically demonstrated in the patent. In so holding, we think we are supported by the opinion of Circuit Judge Woolley in the case of Bethlehem Steel Co. v. Firth Sterling Steel Co., 224 Fed. 937. In this most exhaustive opinion of the prior art in its relationship to external ballistics, a case involving the validity of the Davis patent cited last above, the learned judge discloses in detail the history of the development of the application of mathematical contour to reduce air pressure in the flight of projectiles and points out with illustration and comment the stages of development in the art. In addition to this, the art teaches beyond peradventure that efficient contour and shape of a projectile were dependent upon dimensional proportions. Prior patents to the plaintiff in suit specified form and shape upon mathematical basis, and obviously the one essential requisite to an advance in the art was exact dimensions and precise explanation as to fixed limits of mathematical construction, for the field was already occupied as to contour and design. We say this because without indulging detail comment, the citations of the prior art clearly demonstrate it, beginning with the earliest conceptions of those interested in the art and extending to and beyond the date of plaintiff’s patent. The principles which the plaintiff recognizes, as well as the segregated elements of the patent, were undoubtedly old, and in our analysis of the record had been and were by previous inventors combined in constructing shells.
In Robinson on Patents, vol. 2, pages 18-80, we find the following statement :
“ The inventor has a right to assume that all those who have recourse to his patent for their knowledge of his invention bring with them such an acquaintance with the state of the art as the ordinary practical workmen in that art possess; and if he affords them such information as enables them to practice his invention, he satisfies all the requirements of the law.”
*67 This beneficent principle of patent law favorable to the inventor, when coupled with the mandatory provisions of section 4888, Revised Statutes, which provides, among other things, that the patentee shall file in the Patent Office a full, clear, and concise disclosure of his patent so that one skilled in the art may make, construct, and use the same, and also distinctly claim the part, improvement, or combination which he claims as his invention or discovery, affords, as the cases hold, a just criterion for the construction of a patent, the scope thereof, and meaning and intent of the claims. (McClain v. Ortmayer, 141 U. S. 419; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399; Bethlehem Steel Co. v. Firth Sterling Steel Co., supra.)
We have discussed to some extent the prior art. The “ ordinary practical workmen skilled in that art ” would, we think, approach the construction of a shell in accord with the patentee’s specifications conscious of the fact that an ogival nose, a contour cap, a cylindrical portion of less diameter than the bourrelet exceeding in length the caliber of the projectile, and a beveled or tapered base, were old in the art, and that the information emanating from plaintiff’s specifications informs him that the new conception of design and contour resided in the construction of a shell, first, “ employing a sharp-pointed cap, the ogive of said cap being struck on at least a 7-caliber radius ”; second, the workman is to reduce" the cylinder length of previous shells so that it will but slightly exceed the caliber of the gun; and, third, he is to employ a tapered rear end terminating in a reduced base at right angles to the longitudinal axis of the projectile. Obviously, if the cylinder length of the shot is to be reduced, what constitutes cylinder length is to be defined, and the patentee defines it as extending from the bourrelet to the rotating band. The extent of the reduction is to be slight. What may or may not be regarded as slight is left open to conjecture. Of course, departure from a fixed dimension of minimum consequence is undoubtedly slight, but the patentee is dealing with the subject matter of ordnance, an efficient instrumentality of destruction, under legal obligations in so far as patent law is concerned, to point out *68 how his shell may be made and used. Of one thing certainty is clearly indexed, and that is an abnormal reduction in length does not fall within the specification. Precisely how far one may go is, we think, indefinite and ambiguous. Observations of this character are not in all respects pertinent to the construction of the tapered rear base, for as to this feature of the patent, express information in words and figures is given that it is to be “ a uniform tapered rear end diverging from a line of the cylinder at an angle of 11° 18' and terminating with a base perpendicular to the axis of the shot, and equipped with a base plug, fuse plug, and vent plate 6 of any usual or preferred style, it being understood the base plug opening is sufficiently large to admit a tool for boring out the shot to desired dimensions.” Davis disclosed a projectile of less diameter than the bourrelet, i. e., approximately 33% longer than the caliber or diameter of the shell, whereas the patentee discloses an excess of length of 16.66%. Will, under this information, a shell with an excess length of twenty, twenty-five, thirty, or thirty-three per cent infringe the patent?',
The patentee devotes a large portion of his specifications to mathematical calculations, but is entirely silent upon the above-mentioned point, the mathematical demonstration being confined to computations which point out the advantage of a projectile constructed according to the dimensional proportions asserted in the specifications. The patentee enumerates the lack of symmetry in and the lack of practicability of existing shells to function efficiently, and discloses the purpose of specifying the elements of the patent. An ogival cap, the specifications say, functions to obtain accuracy, range, and striking velocity. It likewise prevents tumbling of the shot due to pressure upon its point and base, and then the patentee expressly asserts that “ If the angle is too abrupt, little or no energy is concerned at high velocity.” To the court the above statements are impressive as conveying to the mind a conception by the patentee of reducing the form and' contour of existing shells to ideal dimensional proportions, sufficient in themselves to attain greater range and accuracy. Ogival formations *69 and sharp-pointed caps integral with the somewhat blunted points of existing shells were old. It was known and established in the art that a soft steel cap, sharply pointed and secured to the ogive of a shell, functioned to decrease air pressure, and to resist striking velocity when the shot came in contact with the hardened armor of naval vessels. As a matter of fact, the art had long taught the value of a soft steel cap secured to the ogive of a shot which functioned to furnish armor plate resistance in the first contact therewith, and thus facilitate the penetration of the blunted and much harder ogive of the shell proper, upon which the final destructive qualities of the shot depended. It is true the soft steel cap so employed varied as to its angular proportions and no uniform caliber radius in the construction of all previous shots had been adopted. Those engaged in developing the art, ordnance officials of the Government of profound and eminent ability and long years of experience, were not in any sense strangers to the necessity for mathematical proportions of a soft steel cap in order to obtain an acutely pointed ogival formation for the cap secured to the ogive of armor-piercing projectiles. The subject matter was a matter of mathematical ascertainment as well as predicated upon experimentation, and the mathematical computations of the patentee, granting arguendo their accuracy and availability, accomplish no more than a demonstration that shells constructed in accord with the figures employed may function in harmony with the results reached. The subject matter of the invention was not one of “ mathematical external ballistics,” and the prior art discloses beyond peradventure that the exercise of invention in this respect was confined to a most narrow compass. No one may now claim novelty for a soft steel cap secured to the ogive of an armor-piercing projectile upon any other possible basis than dimensional construction. In all other respects it is old and well known.
Next the patentee claims novelty in a form of design which reduces the cylinder length of the shell so that its length but slightly exceeds the caliber of the gun. We have adverted to the word slightly. The proportion of length *70 to the diameter of the shot is said by the specifications to reduce skin friction, conserve rotary velocity, and conserve the compressed air enveloping the shot at its highest velocity. The purposes enumerated are clearly, from the record, reducible to one, i. e., the resistance to air pressure. What the plaintiff claims, as explanatory of his claim 3 and his conceptions of novelty as covered by the term “ slightly,” is found in his drawings and specifications (Finding IV); i. e., “ a 12-inch shell * * * and a cylinder length exceeding its diameter by 2 inches or 16.66%.” If the law precludes this source of information in the ascertainment of the scope and intent of the claim, we are without á principle to interpret them, and one skilled in the art is without a specification as to any fixed limitations as to cylinder length of the projectile and clearly subjected to a charge of infringement under circumstances of a lack of knowledge as to what to do or how far one might go to avoid so indefinite a relationship.
In the important case of Steel Wheel Corporation v. B. F. Goodrich Rubber Co., 27 Fed. (2d) 427, 432, the district court said:
“ To uphold a patent such as this one, which specifies ‘ substantial ’ changes as compared with ' standard practice,’ where ‘ standard practice ’ is not defined in the patent, and, in fact, was not a definite thing, would lead to no end of confusion, and no end of litigation. There is no person so skilled in this art that he can, by examining a given tire, and testing it with the tools of all of the laboratories in the world, determine whether or not that particular tire is an infringement.”
Affirmed in 42 Fed. (2d) 406.
See also Minerals Separation v. Butte &c. Mining Co., 250 U. S. 336.
Finally the specifications describe the employment of a tapered rear end. Claim 3 states it as a beveled base, and in detailed explanation of the illustrative figure of the patent it is set forth as “ a uniform tapered rear end diverging from a line of the cylinder at an angle of 11° 18' and terminating with a base perpendicular to the axis of the shot.” Assuredly, standing alone, invention is not to be ascribed *71 upon the broad and seemingly inexhaustible claim of a beveled base. Information as to the construction of the base and in what way may one infringe if he employs a beveled base are essential factors in the art. Aside from the very questionable proposition that the beveled base will function as the patentee asserts, or that he comprehended the difficulties to be overcome from rearward pressure of a shot in flight, we can alone ascertain contour and shape from the specific dimensions given the art in the words and figures quoted last above. Therefore, it is, we think, clearly deducible from the specifications and claims that “the ordinary practical workmen in the art ” could not possibly gain any other concept of the plaintiff’s invention than the one definitely and precisely set forth in a combination of the elements claimed, in accord with the precise dimensions given. In other words, the patentee describes in detail two specific methods of constructing shells, recites the precise dimensions essential to bring a shot into existence according to his design, and, while he claims a broad and comprehensive patent, we are convinced, in view of the prior art and its limited latitude, that all that may be claimed as novel is a conception of a shell constructed as to dimensional proportions in such a precise way as to isolate it from its predecessors in this single respect only; and, while this conclusion is not free from doubt, we are inclined to the opinion that it is invention to evolve an armor-piercing projectile of distinct elements combined in precise mathematical relationships and proportions, notwithstanding the existence of prior projectiles embodying the identical contour and shape brought about, however, upon different dimensions and with regard to different ratios and proportions which will accomplish in a measure the same result. In other words, is it not invention to conceive a shell whose contour' and design, although anticipated, is yet of such a nature that the application of a new formula to its construction results in the attainment of greater accuracy and range? We think the record warrants an assertion that the patentee’s precise formula possessed advantages; and while the combination, in our judgment, because of the prior art, is strictly limited by the specifications and the claim, and the patent very nar *72 row, nevertheless, as observed by the Supreme Court in Richmond Screw Anchor Co. v. United States, 275 U. S. 331, 339, “While thus in a way, he improved an existing idea, he developed a new idea,” and the new idea is reflected in the new dimensional formula for a shell, otherwise the patent encounters the defense of an aggregation of elements long known to the art and involves no more than the exercise of mechanical skill. We believe to the extent noted, and to that extent only, the plaintiff has a valid patent. There is but one type of shell referred to in paragraph (f) of Finding VIII, upon which claim 3 of the patent in suit as regards terminology reads. This single type is the only type manufactured by or for the Government upon which infringement may possibly be predicated. The head of this shell has an ogive of 10.73 calibers, a cylindrical portion of 0.05 inch less in diameter than the bourrelet, with a length from bourrelet to rotating band of 1.06 calibers, and a beveled base terminating in reduced diameter, the bevel being on an angle of 8°. The departure from described dimensional proportions as set forth in plaintiff’s patent is pronounced, and, obviously, from what has been said, it does not infringe the same. All other types involved not only depart from plaintiff’s claim, but do not employ in combination the essential elements of the patent.
The petition will have to be dismissed. It is so ordered.
Williams, Judge; LittletoN, Judge; and GkeeN, Judge, concur.
Whaley, Judge, did not hear this case and took no part in its decision.