## GENERAL CHEMICAL CO. v. ALUMINUM CO. OF AMERICA.

(District Court, W. D. Pennsylvania. October, 7, 1924.)

No. 536.

**1. Patents ⊚⟹127.**

Inventor, in suit against interfering patentee, under Rev. St. § 4918 (Comp. St. § 9463), must particularly point out and distinctly claim his invention.

**2. Patents ⊚⟹157(2).**

Courts will be liberal in construing claim to secure patentee's real invention, but cannot disregard form and language in which claim is made.

**3. Patents ⊚⟹231—Test of infringement of process patent is not identity of product, but identity of patented process.**

Test of infringement of process patent is not identity of product, which is not patented, but identity of patented process in producing unpatented product.

**4. Patents ⊚⟹328.**

Patent No. 1,150,415, for improvements in manufacture of hydrofluoric acid, held not infringed.

In Equity. Patent infringement suit by the General Chemical Company against the Aluminum Company of America. Bill dismissed.

Decree affirmed 11 F.(2d) 813.

Briesen & Schrenk, of New York City, for plaintiff.

Cooper, Kerr & Dunham, of New York City, for defendant.

SCHOONMAKER, District Judge. This is a patent suit, charging infringement of plaintiff's patent No. 1,150,415, issued August 17, 1915, to the plaintiff as assignee of the inventor, H. B. Bishop, upon application filed August 8, 1911, for improvements in the manufacture of hydrofluoric acid. The plaintiff also asserts that the defendant is the owner of two patents taken out by Mr. Fickes, Nos. 1,288,400 and 1,316,569, which patents the plaintiff alleges interfere with the plaintiff's patent. For that reason, the plaintiff, in its bill of complaint in this case, has asked proper relief under section 4918 of the Revised Statutes of the United States.

The art of making hydrofluoric acid is an ancient art. It has long been known that when fluorspar (calcium fluoride, $CaF_2$) is caused to react with sulphuric acid ($H_2SO_4$), hydrofluoric acid gas (HF) will be given off, leaving a residue of calcium sulphate ($CaSO_4$). The reaction is generally expressed as $CaF_2 \ H_2SO_4 \ CaSO_4 \ 2HF$.

Hydrofluoric acid is an extremely corrosive substance, which readily attacks glass

and is destructive to the tissues of the human body. The pot still method of making hydrofluoric acid, which was in general use for many decades prior to Bishop, consisted in the use of pots or pans which were filled with fluorspar and to which sulphuric acid was then admitted. The workmen mixed these two substances with some suitable implement, and then a cover was bolted or fastened to the pan, after which, upon applying heat, the HF gases, coming off, were led through pipes to an absorbing system. The operation consumed about 48 hours before the treatment of one charge in one of these pans was completed. The conditions attendant upon such a process were troublesome, annoying, and dangerous to the workmen, who generally wrapped their hands and faces carefully with treated fabrics to prevent injury. When the reaction was completed, the cover was removed from the pan and the residue was in the form of a baked, hard, solid mass, comparable to a rock, which the workmen then had to remove with picks and other tools before the pan was ready for a new charge.

In addition to the method thus described, there were in the prior art other known methods of agitation of material in the still. Among those may be cited British patent No. 11,963 of 1889 (Defendant's Exhibit U), which covered agitation by blowing compressed air through reacting fluorspar and sulphuric acid; also British patent No. 189 of 1872 (Defendant's Exhibit S), which covered the operation of a rotating stirrer in a pot still in the process of producing gaseous hydrofluoric acid. There was also the Naugatuck process, which provided for the producing of gaseous hydrofluoric acid in a pot still, in which the reacting materials, fluorspar and sulphuric acid, were continually agitated, stirred, and broken up by a rotating stirring blade, and were heated to a gradually increasing temperature during the entire period of reaction.

Into this field came Bishop, whose process for the production of hydrofluoric acid involves the use of a revolving still or tumbling barrel, which continuously carries up the rising side and tumbles over in a cascade or avalanche the mixture of fluorspar and sulphuric acid during the reaction. By this process the reacting materials are placed in a proper proportion in a hopper, and through that hopper continuously fed into a revolving still, which is slightly tilted, so as to permit the residue of calcium sulphate to be taken from the still at the opposite end in the form of fine sand or powder, after the hydrofluoric acid gas has been extracted by the process of heating. Bishop, in his original application, made very particular claims for his invention, by which he claimed a patent monopoly of all possible methods of agitating fluoride and the acid, and the heating of such materials in all possible ways during the agitation thereof in the manufacture of hydrofluoric acid. Of these claims, Nos. 1 and 7, as originally filed, are fairly typical:

"1. The process of making hydrofluoric acid, which consists in agitating a fluoride and an acid and heating said materials during the agitation thereof."

"7. The process of making hydrofluoric acid which consists in agitating calcium fluoride and sulphuric acid, and subsequently simultaneously agitating said substances and heating them to gradually increasing temperatures."

The original seven claims filed by Bishop were rejected by the Patent Office, on the ground that the alleged process "apparently could be carried out in any receptacle provided with a stirrer and the heating means, for example, an ordinary frying pan on a cook stove." In response to this rejection, the present plaintiff, assignee of the Bishop patent, contending that the claims were nevertheless applicable, asked further consideration of them, with the result that they were again rejected; the Examiner saying:

"Upon further consideration, claims 1 to 7, inclusive, are not seen to be patentable, because of lack of invention. Putting the substances in a retort and shaking while heating is well within the claims and is a common method of procedure."

But still the plaintiff, not satisfied, again asked for further consideration, and again the Examiner rejected all the claims, stating: "It is common laboratory practice to place the reacting substances in a vessel, tube, beaker, flask, or retort, and shake or stir while heating, and no invention is seen in doing the same thing with calcium fluoride and sulphuric acid, particularly as these substances are commonly used in generating hydrofluoric acid."

After this rejection, the plaintiff canceled the seven original claims and substituted others, each specifying a gradual heating until the reaction was complete, or agitating the reacting substance to produce a solid in the form of loose particles. However, the Examiner again rejected the application, stating: "It is still considered to involve no invention to heat, while agitating, two materials which react so as to produce a product not caked together."

In the face of all this further rejection,

the Bishop claims 1 to 7, inclusive, were rewritten in the form in which they now appear in the patent, and in the argument in support of these new claims the plaintiff asserted that, in making hydrofluoric acid:

"The methods of agitation commonly employed, such as raking or stirring with a rotary stirring blade, will not operate. It is necessary that a particular kind of agitation is chosen, and this type of agitation is now clearly defined by the claims in the words 'continuously breaking up the entire mass of the reacting materials.' The mass must be substantially wholly broken up, and this must be done continuously. It is submitted that the choice of this particular method of agitation involved the true exercise of the inventive faculties, and this is evidenced by the fact of the previous stagnation of the art. The claims are drawn at present so as to set forth the invention in a limited and specific manner, and it is believed that they are clearly allowable. They are limited to specific materials, such as will form a hard cake upon reacting, to such agitation of the reacting substances as will break up into pieces the entire mass thereof; the breaking up process being continuous and being carried on during the reaction."

On this restatement of the Bishop claims and reargument, the patent was allowed.

[1] From this it would appear that the plaintiff's patent is not a broad patent; that it does not cover all methods of agitation of fluorspar and sulphuric acid, but only covers that particular method of agitation set forth in the description of plaintiff's operation. It was the duty of the inventor, under the statute, "to particularly point out and distinctly claim" his invention. Therefore:

[2] "Courts will be liberal in so construing a claim as to secure to the patentee his real invention, but in doing so they cannot disregard the form and language in which the inventor has chosen to make his claim. To give him more than he actually claims would import infinite confusion into the administration of the patent law, as well as contravene the statute itself." Empire Cream Separator Co. v. Electric Candy Mach. Co., 166 F. 764, 766, 92 C. C. A. 444.

"The protection afforded by a patent is specified in the claims, and the public have a right to rely upon the language of the claims in determining how far the patentee's rights go. A patent, like any other grant, is a two-sided instrument, and the intent of the grantor (the public) as to what was covered is as important as that of the grantee." American Roll Gold Leaf Co. et al. v. W. H. Coe Mfg.

Co. et al., 212 F. 720, 129 C. C. A. 330 (C. C. A. 1st Cir.)

"* * * The courts have no right to enlarge a patent beyond the scope of its claim as allowed by the Patent Office. * * * As patents are procured ex parte, the public is not bound by them, but the patentees are. And the latter cannot show that their invention is broader than the terms of their claim, or, if broader, they must be held to have surrendered the surplus to the public." Minerals Separation, Limited, v. Butte, etc., Mining Co., 39 S. Ct. 496, 250 U. S. 336, 63 L. Ed. 1019, quoting Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274, 278, 24 L. Ed. 344.

[3] We can see no escape from the conclusion that the plaintiff's patent is limited to the particular type of agitation specified; this plaintiff's patent is a process patent; the results accomplished are not the test of infringement. "The test of infringement of a process patent is not identity of a product which is not patented, but identity of patented process in producing an unpatented product." Fried. Krupp Aktien Gesellschaft v. Midvale Steel Co., 191 F. 588, 594, 112 C. C. A. 194, 200.

With this in our mind, we now come to consider the defendant's process. Shortly after the plaintiff's process was put into operation, the defendant came into the field with its process, and there was no evidence that the defendant was acquainted with the plaintiff's process at the time the defendant perfected its process of manufacturing hydrofluoric acid. The defendant's process is carried out, not in a revolving or rotary still, but in a covered stationary trough with a cylindrical bottom. This trough is inclined slightly from the horizontal, and through it extends a revolving shaft provided with radial arms arranged in screw thread fashion, provided at their ends with blades or scrapers which are parallel with the shaft or inclined at an angle thereto and curved like a ribbon conveyor. The trough is heated by a furnace at the lower end, from which the flame and combustion gases are conducted by a brickwork or setting along the bottom sides of the trough or still toward the upper end.

The fluorspar and sulphuric acid are not mixed in a hopper previous to being introduced into this still, as in the Bishop process, but they are supplied separately, without previous mixing, at the upper end farthest from the furnace. The spar and acid thus supplied to the still are stirred and carried forward to the outlet end by the paddles and scrapers. In traveling slowly down the still,

the reacting spar and sulphuric acid form a layer five or six inches deep. As the blades on the shaft revolve, they enter this layer of material downwardly at one side thereof, and pass through the layer and emerge upwardly at the other side, scraping the bottom of the retort, and stirring and agitating the material slowly. In this connection, it will be noted that the practice of the plaintiff carries the entire mass of reacting material in the revolving still, so that it is all carried up one side and allowed to tumble down again, whereas the material in the defendant's still is static, with a series of slowly moving paddles going through, each blade making a separate furrow.

If we limited the plaintiff's patent, as we must, by the limitations placed upon it in its proceedings through the Patent Office, there can be no escape from the conclusion that the type of agitation applied to the reacting spar and acid by the plaintiff and the defendant are entirely different, and the only conclusion we can reach is that the two processes produce substantially the same results. The plaintiff in his argument before the Patent Office distinctly claims that the type of agitation provided by the plaintiff was the only kind that would produce the results. In this the plaintiff must have been in error, but nevertheless in the plaintiff's argument before the Patent Office, it stated:

"Methods of agitation commonly employed, such as raking or stirring with a radial stirring blade will not operate; it is necessary that a particular kind of agitation be chosen, and this type of agitation is now clearly defined by the claims in the words 'continuously breaking up the entire mass of reacting materials.'"

It is apparent that the patentable novelty claimed by the plaintiff was to be found only in the particular kind of agitation due to the action of a rotary drum used by the plaintiff, which produced what the witnesses for the plaintiff described as an avalanching action upon the reacting materials in the still. In the defendant's process, there is no avalanching effect. *The entire mass of material is not constantly broken up* by the action of the rotary still; but the material rests in a layer in the stationary trough, and is agitated by rotary stirring blades. In this connection, it may be noted that there is nothing new in the rotary still used by the plaintiff in the execution of its process; that was old and well known to the arts in making other acids.

[4] We therefore find that the defendant's process does not infringe the plaintiff's patent. It is unnecessary for us, therefore, to pass upon the question of whether or not the Fickes patent interferes with the Bishop patent, and we make no finding in that particular. We merely find that the process which the defendant is using does not infringe the plaintiff's patent. It may be noted in this connection that Mr. Fickes, the owner of the Fickes patent, is not a party to this action, and it is very doubtful whether the court would have legal authority to grant relief under Rev. St. § 4918 (Comp. St. § 9463). At the most, from the evidence in this case, it could only be stated that the defendant is the equitable owner of the Fickes patent, and not the owner of record.

We conclude that the defendant is entitled to its decree dismissing the plaintiff's bill, with costs, and a decree to that end may be submitted.