## METALS RECOVERY CO. v. ANACONDA COPPER MIN. CO.

Circuit Court of Appeals, Ninth Circuit.
January 14, 1929.

No. 5529.

William H. Davis and Merton W. Sage, both of New York City, and Edward B. Howell, of Butte, Mont., for appellant.

L. O. Evans, of Butte, Mont., and Charles Neave and John F. Neary, both of New York City, for appellee.

Before GILBERT, DIETRICH, and HUNT, Circuit Judges.

DIETRICH, Circuit Judge. As the holder of patent No. 1,364,304 (issued January 4, 1921, to Clement L. Perkins on application filed July 21, 1919), appellant brought this suit to enjoin infringement. The patent relates to "improvements in flotation of minerals." See Hyde v. Minerals Separation, Ltd. (C. C. A.) 214 F. 100; Minerals Separation v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Butte & Superior Mining Co. v. Minerals Separation, Ltd. (C. C. A.) 250 F. 241; Minerals Separation v. Butte & Superior Mining Co., 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019. Thereunder, as before, the flotation operation consists in grinding the ore to a powder, adding a small quantity of some foreign substance or substances useful in creating a mineral-bearing froth, mixing with water to give fluidity, aerating the mixture by agitation, and drawing off the resultant froth or scum. The foreign substance or substances perform two essential functions; not only must a froth be generated, but the metalliferous particles of the slime must be so affected that they will adhere to the froth films and consequently be lifted to the surface. The two functions are commonly characterized as frothing and collecting, and may both be exercised by a single agent, or separately by different agents. Most of the important agents known to the prior art were oleaginous, and most, if not all, in various degrees performed both functions; some being predominantly frothers and others predominantly collectors. It was also known that in using a combination of two or more agents the proportions should be such as to give the best results with the particular ore under treatment.

Quoting from the patent application, the alleged invention "is based upon the discovery that improved results can be obtained by carrying out the flotation operation with the

addition, to the ore or mineral pulp, of certain non-oleaginous solid organic compounds which themselves have substantially no frothing properties but which have valuable properties as collecting agents." The collecting power or activity of the agent, whether chemical or mechanical, seems to be somewhat of a mystery. In the patent Perkins suggests certain possible theories, but expressly declines to commit himself to any one of them. We are informed by the patent that while the collecting agents therein referred to "are substantially insoluble and are commonly referred to as insoluble nevertheless they are soluble to a very small degree," and that it is by reason of this solubility that they are able to perform the desired function; and further that by "non-frothing" is meant "substantially non-frothing"; that among such collecting agents "are included certain of the aromatic, thio-ureas and many of the azo and diazo compounds"; that one which the patentee "found of particular value is diazo-amino-benzene"; that "it is of advantage in many cases to add to the ore pulp a small amount of alkali which may be sufficient in amount to give to the ore pulp a distinct alkaline reaction." We are further informed that the amount of the collecting agent to be used will vary, and that the patentee had obtained good results with one-thirtieth of a pound to a ton of ore, but that more may be used, and he seems to think that ordinarily one-fourth of a pound is as little as should be used. By way of illustration, there are set forth four specific separation tests, in all of which diazo-amino-benzene was used as the collector and as a frother terpineol was used in two, pine oil in one, and in the other xylidin. Xylidin is spoken of as both a solvent and a frothing agent, and certain other chemicals are named as having like properties. Finally, we are informed that "the process in which organic nitrogen compounds, including azo and diazo compounds," are used, is claimed in a separate companion application, and that the "process in which thio-urea and other nitrogen-sulphur compounds, such as thio-carbanilid," are used, is claimed in two other patent applications made jointly by Perkins and one Sayre. Admittedly out of a large number of similar chemical substances tested by him, Perkins discovered a few that were superior collectors. No one of these, however, is used by the defendant, and all are covered either by claims of the instant patent which are not here in issue, or by other patents, so that, whatever the event of this suit, Perkins and his assigns hold a patent monopoly on all specific substances by him found to have superior collecting properties. But plaintiff's contention is that xanthate, the collecting agent used by defendant, falls within the scope of its patent claims, 1, 2, 3, and 4 (the only claims pleaded), which undoubtedly are broad enough to include not only the specific substances so discovered by the patentee, but a multitude of others which he had not found to have collecting properties, and many, if not most, of which are known to have no value for that purpose.

Claim 1 is as follows: "The method of effecting the concentration of minerals by flotation, which comprises adding to the mineral pulp a small amount of a substantially non-oleaginous organic mineral collecting agent which is substantially non-frothing, and subjecting the resulting mixture to a froth flotation operation; substantially as described."

No. 2 is like No. 1, except that it expressly provides that with the collector there shall be added "an agent having good frothing properties." Nos. 3 and 4 correspond respectively to 1 and 2 with a substitution of the phrase "reduced and easily oxidizable" for the term "non-oleaginous."

In short, it would seem that (excepting only the one contingency of a self-frothing ore) the patent assumes the use of some known frothing agent not otherwise described and is concerned only with the collecting agent which, in claim 1, is described as being a "substantially non-oleaginous organic mineral," that is, "substantially non-frothing," in claim 2, as a "substantially non-frothing non-oleaginous organic mineral," in claim 3, as a "reduced and easily oxidizable mineral," and in claim 4, as a "reduced and easily oxidizable organic mineral" "which is substantially non-frothing." There is disclosed no new process of flotation and no new frothing agent. Such novelty, if any, as is shown, consists in two classes of collecting agents, both described as substantially non-frothing organic minerals, the one being "substantially non-oleaginous" and the other being "reduced and easily oxidizable."

Upon an analysis of the entire application, we are convinced that Perkins intended to claim, and to claim only, that his invention consisted in discovering that certain substances and classes of substances then unknown to the art are good collectors but have little frothing capacity. Nor could he reasonably claim more. In an attempt to interpret the patent as including a principle or process, counsel for appellant say the "invention constitutes an idea of means based upon the discovery of a new capability or force in nature," but what force or capability is not

made clear. Certainly not the selective or collecting force or property, for admittedly its existence "in nature" was well known. Equally untenable is the position that Perkins was the first to discover that there are substances having good collecting but no frothing capacity, or to conceive of a process employing two or more agents which perform but one of the two functions, or to appreciate the value in practice of such a process. Fairly interpreted, the patent imports no such claim, nor would it be consistent with established facts. Ores there are in great variety, and, as was well known, flotation agents giving good results with one may be ineffective with another. In the treatment of a particular ore a certain agent may disclose an excess of frothing capacity and a deficiency in collecting power, or the reverse. To meet such exigencies, long before Perkins came into the field various combinations were made of relatively powerful frothing agents with relatively powerful collectors to secure a balanced capacity adapted to the particular ore under treatment. And in that connection it is to be noted that apparently all agents have both capacities to some degree.

In appellant's argument the unwarranted assumption is made that Perkins discovered agents of high collecting but with no frothing capacity. The patent makes no such claim, but speaks of agents which have no "substantial" frothing properties, and the record abundantly shows that the characterization is relative and conditional. A collector which, when used in small quantities in the treatment of a particular ore, develops only a negligible amount of froth, may be also effective as a frother if applied in larger quantities in the treatment of another ore. It is of no moment to say that prior to Perkins most of the flotation agents were oils or oleaginous substances. He may have discovered new agents, but the question we are here considering is whether he is to be credited with the conception of the combination in practice of two substances each of which performs but one of the two requisite functions. Such a conception we hold was familiar to the art. Thus in the issue of Metallurgical and Chemical Engineering of February 1, 1916, it is said: "Broadly stated, flotation oils may be classed as 'frothing' oils and 'collecting' oils. There is at times some difficulty in grasping the distinction between frothers and collectors as such, for one oil in itself may, and often does, possess both frothing and collecting properties. The action of a frothing oil is such as to produce froth in greater or less amount dependent on the frothing

power of the oil. A collecting oil has a collecting power for sulphides in preponderance over its frothing action, being therefore, so to speak, a poor frother; a collecting oil may have simply a collecting action and little or no frothing action. * * * On some ores crude pine tar combines the properties both of frothing and collecting; on other ores it is necessary to enrich the pine tar with some such oil as turpentine, pine oil, or wood creosote. Unquestionably pine oil (steam refined or crude) is the best frothing agent known. * * * So-called mineral oils and tar oils do not generally form a good flotation froth but have a marked selective action on the sulphite minerals." In the issue of May 13, 1916, of the Mining and Scientific Press, M. H. Thronberry gives an interesting description of experiments with soap as a frothing agent, in the course of which he says: "Before running any charges in a machine, a series of preliminary tests was made of all the oils in stock in order to classify them as 'frothing' and 'non-frothing.' After this classification was made a number of experiments were performed with the selective oil that was best suited for this ore as a collector of lead and that at the same time did not interfere with the frothing agent." And one of his conclusions was that, "Soap can be used as a frothing agent in the flotation of galena when used in combination with a suitable selective oil."

The case of Minerals Separation v. Butte, etc., Mining Co., was tried in April, 1917, prior to the date of Perkins' claimed invention, and it will be noted that in the opinion of the Supreme Court (250 U. S. 336, 349, 39 S. Ct. 496 [63 L. Ed. 1019]) frothing and non-frothing oils are referred to as a recognized classification. Indeed, Taggart, one of plaintiff's expert witnesses, testified: "When the oil flotation process became important it was discovered that some of the oils had predominantly a collecting character and some of them had predominantly the frothing characteristics. When difficulty arose in treating an ore with a simple oil, it was usual to compound mixtures of oils, using one or more for frothing purposes and one or more for collecting purposes." And Perkins himself testified that: "There were two classes of oils that were used—coal tar and pine oil were the common ones. I think that the general idea was that one of them was used peculiarly because of its frothing properties and the other peculiarly because of its collecting properties."

While the consideration is not highly material, it appears from certain earlier patents

that this conception was not limited to a classification of oils, but extended to non-oleaginous substances as distinctively or predominantly collectors. See British patent No. 26,852 of 1908 to Minerals Separation; American patent No. 962,678 of 1910 to Sulman and others; German patent No. 272,919 of 1913 to Langguth; American patent No. 1,055,495 of 1913 to Schick; American patents Nos. 1,228,183 and 1,228,184 of 1917, to Corliss; and American patent No. 1,240,597 of 1917 to Perkins. The specific substances named in these three patents to Corliss and Perkins are alpha-napthylamin, commercially known as X-cake, nitro-napthalene and beta-napthylamin, all of which, it will be noted, are organic, solid, and non-oleaginous. ▮ No one of the four claims in suit names a specific substance, but each purports only to describe a class. In the light of the admitted facts, we are of the opinion the description is too indefinite and comprehensive. The number of substances falling within it is enormous—in excess of 250,000. Of these Perkins tested only a small percentage, and in such tests he found but few collectors thought to be effective under any conditions. Out of many, selected as being representative and tested by experts in preparing the case for trial, but few disclosed valuable collecting properties. To say that appellant is claiming only such substances within the class description as are in fact good collectors is to beg the question. To obtain the monopoly afforded by a patent, the patentee is required to disclose what he has found, and not merely to suggest that something may be found, by further and extensive experimentation. A generic monopoly must rest upon a generic discovery; and this Perkins did not make. We entertain no doubt that the claims come under the condemnation of The Incandescent Lamp Case, 159 U. S. 465, 16 S. Ct. 75, 40 L. Ed. 221, and other decisions therein cited, and also of the recent case of Corona Cord Tire Co. v. Dovan Chemical Corporation, 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610.

While this conclusion is controlling and dispenses with the necessity of discussing other defenses, we may add that upon a consideration of the findings of the court below to the effect that xanthate, the alleged infringing agent employed by defendant, does not fall within the patent claims, fairly interpreted, and that it was discovered by one Martin approximately two years prior to the claimed date of Perkins' invention, we are not convinced they should be disturbed. Not only is Martin's testimony corroborated by that of other witnesses, but his notes and reports made in February, 1915, constitute indubitable proofs.

Affirmed.

HUNT, Circuit Judge, took no part.