## MARTIN v. MINERALS SEPARATION NORTH AMERICAN CORPORATION.

### No. 2550.

District Court, D. Maryland.
July 14, 1939.

Cook & Markell (by Charles Markell Jr.), of Baltimore, Md., and Darby & Darby (by Samuel E. Darby, Jr., Floyd H. Crews, and Donald J. Overocker), of New York City, for plaintiff.

Venable, Baetjer & Howard (by Charles McHenry Howard and Norwood B. Orrick), of Baltimore, Md., Cooper, Kerr & Dunham (by Drury Cooper), and Cook, Nathan, Lehman & Greenman (by Alfred A. Cook, Henry Cohen, and J. Howard Rossbach), all of New York City, for defendant.

WILLIAM C. COLEMAN, District Judge.

This suit, filed on June 20, 1938, is for alleged breach of a contract made on March 6, 1915, between the plaintiff and an English corporation known as Minerals Separation, Ltd., from which the present defendant acquired its assets in the United States and assumed its liabilities here. For convenience, hereafter the present defendant and its assignor, the English company, will be considered as one and the same, and spoken of as the defendant.

The material facts are as follows. Originally, the plaintiff undertook to disclose to the defendant several inventions which he claimed constituted patentable improvements on the method of concentrating mineral bearing ore by flotation, the defendant controlling the basic patents on this process. Flotation is one of the steps in the process of recovering mineral from ore by treating the ore so as to obtain a product containing a higher concentration of the mineral, and it is this product which is sent to the smelter. Copper ore, for example, contains only a small percentage of copper, when it leaves the ground, so the ore is first crushed into fine pieces. Water is added and it is put into large tanks where it is vigorously agitated by mechanical means so that large air bubbles are formed in a froth on the surface of the mixture. If very small amounts of certain types of oil are added, these air bubbles become firm and capable of bearing the weight of the mineral bearing particles of the crushed ore which attach themselves to the bubbles. This froth is then taken off, dried, and sent to the smelter.

The defendant took an option on March 6, 1915, to purchase these alleged inventions for $5,000. The contract contained the following provision: "If, in the opinion of the Company, Martin's reagents, modified oils or other chemicals useful for flotation concentration of ores can be successfully and profitably manufactured as a patented flotation oil or reagent; the Company will do their best to form a corporation for such manufacture or to arrange with a suitable corporation or group for the manufacture of the same and the Company will pay Martin twenty five per cent. (25%) of the net profits received by the Company therefrom." By another contract executed at the same time, the defendant employed the plaintiff as a research chemist at a salary of $5,000 annually. This contract contained the usual clause providing for assignment to the defendant of any inventions made or completed by the plaintiff while in defendant's employ. Thereafter, plaintiff made disclosure of seven alleged inventions, each purporting to cover the use of reagents in flotation and all of them were given names which the plaintiff coined but none of these names bears relation to any known chemical terminology. Stanol is one of these reagents upon which plaintiff relies in the present suit. While extensive work and demonstrations were conducted by the plaintiff in connection with these reagents, particularly in connection with the ores of the Anaconda Copper Mining Company, plaintiff reported that stanol was not satisfactory for this ore and this was the only report that he ever made as to results of any tests by him with stanol; and while applications were made for patents in connection with two of his other reagents which had given successful results, no application was filed for stanol. Early in 1917 the two patents applied for were issued, and, in due course, the defendant exercised its option under the contract above referred to and paid $5,000 to the plaintiff for same.

Thereafter, plaintiff remained in defendant's employ as a research chemist until July 1926 and continued his experiments with many different reagents. In March, 1923, that is, eight years after plaintiff had entered defendant's employ, one Cornelius H. Keller, the assayer in defendant's laboratory in San Francisco, discovered that by the use of the compound known as xanthate, the results of the flotation process could be greatly improved and a pat-

ent was issued to Keller on September 22nd, 1925 (No. 1,554,216). Xanthate was introduced throughout the mining industry and it received much publicity. Arrangements were made for its manufacture in large quantities to supply those desiring to use it in the flotation process, although plaintiff continued to urge the value of other reagents which he had conceived. However, late in 1925, or early in 1926, plaintiff asserted that he had discovered the value of xanthate in the flotation process more than ten years before. This was denied on behalf of the defendant, and in June, 1926, he resigned, and his resignation took effect the following July 3rd. However, before this latter date, plaintiff filed application in the Patent Office for a patent on the use of xanthate in flotation. After first rejecting the claims, the Patent Office declared an interference in plaintiff's application, and the Keller patent which had been assigned to the defendant company. In May, 1930, the interference was dissolved by the Examiner of Patents, he deciding that plaintiff was barred by the extensive public use of xanthate for more than two years before he made his application. This decision was affirmed on appeal in the Patent Office and in the Court of Customs and Patent Appeals, the litigation finally ending in January, 1935.

It is appropriate here to explain that xanthate has only slight frothing properties but is an efficient collecting agent, widely used because of its low cost. It is a solid crystalline compound and has been an unpatentable substance for more than one hundred years. While its use in flotation has been the subject of discovery and patent, the compound itself is not. Neither the defendant nor its predecessors manufactured potassium xanthate, sodium xanthate or plaintiff's stanol, or received any profits from any person or corporation who manufactures any of these compounds. However, defendant has derived profits in excess of $12,000 from royalties paid to it by its licensees for the use of potassium xanthate or sodium xanthate in the process for concentration of ores by flotation.

While there are numerous other and involved questions in the present litigation, defendant, at the outset, has raised by way of defense, and the clause in the contract above quoted clearly presents, a question of law upon the answer to which depends plaintiff's right to proceed with his suit. That is to say, defendant contends that the clause in the contract above quoted draws a definite distinction between (1) royalties to be earned from the patent on the use in flotation of any of Martin's reagents, and (2) profit to be made from manufacturing any of his reagents; in other words, that, by the contract, Martin was to have no claim to or share in the royalties, because he sold outright to defendant his rights to any flotation process he might disclose, whether or not involving the use of reagents; but he was to have a share of any profits which defendant might make from manufacturing any of his reagents. Thus defendant claims that the contract limits the plaintiff to a claim for a share of profits from the manufacture of xanthate, and that since defendant has derived no profit, directly or indirectly, from such manufacture, plaintiff's suit must fail at the outset.

It being clear that the issue thus raised by the contract should be separately heard before the hearing of any other issues, this Court limited testimony and arguments thereto.

We see no escape from the distinction contended for by defendant. Plaintiff's rights must be determined by the contract. It is very clear that the contract draws a distinction between profits which the defendant might make from licensing under patent the use in flotation of any of Martin's reagents, and the profits which it might derive from manufacturing such reagents. Only to the latter does the profit-sharing provision apply. The distinction is clearly made, by the language employed, between a process and an article. "Reagent" is defined as "any substance, which by reason of its capacity for taking part in certain reactions, is used in detecting, examining, or measuring other substances, in preparing material, etc." "Process," on the other hand, is defined as "a series of actions, motions, or occurrences; progressive act or transaction; continuous operation or treatment; a method of operation or treatment." Webster's New International Dictionary.

It is significant in this connection that there have never been any patented reagents of the character here involved; that no non-process claims are in the Keller patent, and that no processes, but only reagents, were surrendered by Martin under his contract.

From an understanding of the patent situation as it existed in 1915, it becomes evident that it was intended by the con-

tract to draw a distinction between royalties and manufacturing profits. The flotation process was under the control of Minerals Separation Ltd. No efforts had been made to introduce it into the mineral refining industry in the United States until 1910. Such efforts resulted in protracted litigation over the validity of the basic flotation patents. See Minerals Separation Ltd. v. Hyde, 242 U.S. 261, 37 S. Ct. 82, 61 L.Ed. 286; Minerals Separation Ltd. v. Butte & Superior Mining Co., 250 U.S. 336, 39 S.Ct. 496, 63 L.Ed. 1019. A number of producers, including the Anaconda Copper Mining Co., did not join in this litigation, and they enjoyed the use of defendant's patents at uniform rates. The license agreements were identical. Any improvement in the flotation process which Minerals Separation Ltd. might acquire in the future was assured to the licensee without additional royalty. Thus, Minerals Separation Ltd. could not promise any one a share of its royalties in return for the rights to improvements on its process, because any improvement would not increase its own royalties, and to share existing royalties would be equivalent to surrendering the benefits of the basic inventions made by others. This is confirmed by the fact that Martin's inventions were purchased from him for a fixed sum of money, without further claims by him.

However, as respects the manufacture of any reagents the situation was obviously different. Defendant was not required to supply to its licensees the *materials* for its process. The gist of the plaintiff's contention appears to be that in 1923 when the Keller invention was brought forward, the situation had changed and xanthate then became so important to the defendant that its royalty rates were adjusted on the basis of that invention at the expense of possible manufacturing profit. However this may be, and without deciding because it is unnecessary to do so, that, as defendant claims, its royalty rates were negotiated in 1924 without regard to the uncertain situation with respect to xanthate, and that the price of xanthate was fixed at that time by forces beyond defendant's control, and without regard to the royalty situation, the fact remains undisputed that neither the defendant nor its predecessors manufactured xanthate, or plaintiff's stanol, or received any profits from any person or corporation who manufactured xanthate or stanol.

The bill of complaint must, therefore, be dismissed.